**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**



05 CV 4439

| | |
|---|---|
| LINDA ADAMS, individually and on behalf of all others similarly situated, )<br><br>　　　　　Plaintiff, )<br><br>　　v. )<br><br>AMERICAN INTERNATIONAL GROUP, INC., MAURICE R. GREENBERG, HOWARD I. SMITH, DONALD P. KANAK, MARTIN J. SULLIVAN, RICHARD A. GROSIAK, AXEL I. FREUDMANN, JOHN DOES 1-20 (AIG RETIREMENT BOARD), and PATRICIA R. MCCANN<br><br>　　　　　Defendants. | Civil Action No:<br><br>**CLASS ACTION**<br><br> |

**COMPLAINT FOR VIOLATIONS OF EMPLOYEE RETIREMENT INCOME SECURITY ACTION**

Plaintiff, individually and on behalf of all others similarly situated, alleges as follows:

### I. INTRODUCTION

1. This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries for the AIG Incentive Savings Plan, the American General Employees' Thrift and Incentive Plan, and the American General Agents' and Managers' Thrift Plan (the "Plans") for the violations of ERISA alleged herein.

2. Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the Class Period (December 1, 1998 to the present).

1

3. Specifically, Plaintiff alleges in Count I that the Defendants, responsible for the investment of the assets of the Plans, breached their fiduciary duties to Plaintiff in violation of ERISA by failing to prudently and loyally manage the Plans' investment in AIG stock when the stock no longer was a prudent investment for participants' retirement savings. In Count II, Plaintiff alleges that Defendants who communicated with participants regarding the Plans' assets, or had a duty to do so, failed to provide participants with complete and accurate information regarding AIG stock sufficient to advise participants of the true risks of investing their retirement savings in AIG stock. In Count III, Plaintiff alleges that Defendants, responsible for the selection, removal, and, thus, monitoring of the Plans' fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. Finally, in Count IV, Plaintiff states a claim against AIG for knowing participation in the fiduciary breaches alleged herein.

4. As more fully explained below, during the Class Period, Defendants imprudently permitted the Plans to hold and acquire hundreds of millions of dollars in AIG stock. They did so despite the fact that Defendants knew or should have known that AIG was engaging in highly risky if not illegal activities which artificially inflated the value of AIG stock, and, thus, that AIG stock no longer was a prudent and appropriate investment for participants' retirement savings. Defendants' breaches alleged herein caused the Plan to incur enormous losses.

5. The wrongdoing alleged herein permeated AIG and encompassed its manner of obtaining business, including the employment of and participation in large-scale "bid-rigging" and "steering" schemes; improper utilization of nontraditional insurance products and reinsurance transactions which amounted to sham transactions, and improper characterization of corporate relationships and transactions for accounting purposes to make AIG appear more profitable than it was; and widespread improper accounting, which has resulted in the delay, three times, of the issuance of AIG's annual report on SEC Form 10-k; the announcement of an expected restatement of approximately $2.7 billion and restatement for the years from 2000

2

through 2004. The alleged wrongdoing was so pervasive that it could not have reasonably been unknown by the defendants named herein. As a result, the Plans suffered substantial losses. Plaintiffs and the other participants and beneficiaries of the Plans owned AIG stock through the Plans and have suffered losses thereby.

6.     On October 14, 2004, the New York State Attorney General's office announced that AIG was a participant in a massive insurance bid-rigging and contingent commission scheme in which AIG paid illegal "kickbacks" to Marsh & McLennan to ensure placement and renewal of insurance business with AIG, which scheme defrauded countless AIG customers and Marsh & McLennan clients and customers. In this connection, the New York State Attorney General announced that two AIG executives had pled guilty to a first-degree felony count of a "scheme to defraud" with respect to the insurance steering and bid-rigging scheme.

7.     As a result of this shocking news, AIG's stock price plummeted $6.80 per share, or 10.15%, from $66.99 per share on October 13, 2004 to $60.19 per share on October 14, 2004. AIG's stock price continued its decline the next day on October 15, 2004, falling an additional $2.34 per share to $57.85 per share, representing a two-day stock price decline of $9.14 per share or 13.64%.

8.     On October 15, 2004, it was publicly reported in a *CBSMarketWatch* article that AIG had launched an internal investigation after it received a subpoena from the Attorney General approximately a month prior to October 15, 2004. Defendant Maurice Greenberg ("Greenberg") publicly stated that the investigation revealed that the two executives who pled guilty committed wrongdoing, but that the investigation had so far not uncovered wrongdoing by any other employees. Greenberg added that the internal probe had not found that any of AIG's top management were involved or knew about improper bidding.

9.     On February 9, 2005, the *Associated Press* reported that Greenberg, in a conference call with analysts, assured investors "that our business overall looks good" and that the internal probe prompted by the New York Attorney General's investigation was complete.

3

10.     However, six days later, on February 15, 2005, it was publicly reported that two more AIG executives, including a vice president in a unit of AIG, and an AIG underwriter, pleaded guilty to criminal charges in New York State's probe of bid-rigging and contingent commission fee agreements in the insurance industry, along with a third executive from Marsh & McLennan.  The AIG vice president pled guilty to one felony count of scheme to defraud, and the AIG underwriter pled guilty to a misdemeanor count of scheme to defraud.  The New York Attorney General's office statement issued in connection therewith noted that "All three defendants admitted to participating in a scheme that allowed Marsh, the nation's largest insurance broker, to protect incumbent insurance carriers when their business was up for renewal."  In a strong indication that the pleas announced thus far were the tip of the iceberg, the statement added that "The defendants in today's cases are expected to testify in future cases," and the Attorney General underscored in his comments that the state's investigation "is continuing."

11.     In addition to the massive "bid-rigging" and contingent commission fee scheme, on February 14, 2005, AIG announced that it received subpoenas from the SEC and the New York Attorney General's Office requesting information related to AIG's abuses of nontraditional insurance products and alternative risk transfer transactions, and AIG's accounting for such transactions. Finite reinsurance products have recently been identified as a method companies use to manipulate revenues and required insurance reserves to "dress up" its earnings statement. This was the first indication that AIG had engaged in extensive instances of accounting fraud and gimmickry to maintain its extraordinary history of consistent and strong growth in an industry known for greater volatility.

12.     A *Wall Street Journal* article, dated March 8, 2005, reported that Defendant Greenberg personally received a subpoena from the New York Attorney General's office regarding the Company's reinsurance transactions.

4

13.     On March 15, 2005, AIG announced that Greenberg had resigned as Chief Executive Officer of AIG, and that AIG's Chief Financial Officer, Defendant Howard I. Smith ("Smith"), was placed on leave.  It was later reported that Greenberg may have caused or allowed Company documents, sought by the New York Attorney General, to be removed from AIG's Bermuda office or destroyed.

14.     On March 22, 2005, *a New York Times* article reported that Smith and Christian Milton, AIG's vice president for reinsurance, were both terminated by AIG after invoking their Fifth Amendment rights against self-incrimination in response to inquiries by regulators investigating reinsurance transactions.  AIG stated publicly that "Mr. Smith and Mr. Milton were terminated pursuant to company policy that requires employees to cooperate with government authorities on matters pertaining to the company.'

15.     On March 28, 2005, a *Wall Street Journal* article reported that the SEC subpoenaed as many as 12 executives at AIG as part of an ongoing investigation into the Company's accounting practices.

16.     Later that same evening, the Board of Directors of AIG announced that Greenberg had retired from his position as Chairman of the Board and that he would not stand for re-election to the Board at the next AIG annual shareholders meeting.

17.     On March 30, 2005, AIG publicly stated that an internal investigation revealed that several nontraditional insurance products transactions "appear to have been structured for the sole purpose or primary purpose of accomplishing a desired accounting effect" and that one series of reinsurance transactions, which included transactions going as far back as to 1991, may require AIG to reduce net worth by $1.1 billion. This included AIG's admission that Union Excess Reinsurance Co. Ltd. and Richmond Insurance Co., both offshore companies, should have been treated as AIG companies instead of being treated as separate companies.  Based on these admissions, it has been publicly reported that the Company may have to lower its book value by at least $1.7 billion.   It has also been reported that other off-shore entities and

5

reinsurance transactions being investigated may require AIG to restate its book value even further.

18.     By May 3, 2003, still more revelations delayed issuance of AIG's 10-k until May 3, 2005. *The New York Times* reported May 3, 2005 that AIG released a list of even more accounting maneuvers and gimmickry, each designed to improve AIG's balance sheet to maintain the appearance of consistent growth and strong financial standing. AIG reported that its reinstatement would total $2.7 billion.

19.     As of April 1, 2005, AIG's stock price fell to a low of $50.95 per share, or a 45.7% decrease in value from its price of $93.96 on December 1, 9998, at the beginning of the Class Period. Moreover, this represents a 34% decrease in value from AIG's per share price of $77.23 on August 29, 2001, and date when (1) AIG completed its acquisition of AGC; and (2) AGC common stock held under the American General Employees' Thrift and Incentive Plan, and the American General Agents' and Mangers' Thrift Plan was exchanged for AIG common stock.

20.     The Plans were heavily invested in AIG stock and as a result, suffered substantial losses.

21.     This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

22.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for plan-wide relief for breaches of fiduciary duty, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period.

6

23.     In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend her Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## II. JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

25.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## III.    PARTIES

**A.    Plaintiff**

26.     Plaintiff Linda Adams is a resident of Nashville, Tennessee, and worked at AIG for over 37 years. During the Class period, she was a participant in the American General Employees' Thrift and Incentive Plan and then AIG Incentive Savings Plan. (On January 1, 2003, the American General Employees' Thrift and Incentive Plan was merged into the AIG Incentive Savings Plan). During the Class Period, as a result of her and the Company's contributions, Plaintiff Adams acquired and held shares of AIG stock in her Plan account.

**B.    Defendants.**

27. **Defendant American International Group, Inc. ("AIG")** is a holding company, which through its subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad. AIG is the leading U.S. based international insurance

7

organization and among the largest underwriters of commercial and industrial insurance in the United States. Its member companies write property, casualty, marine, life and financial services insurance in approximately 130 countries and jurisdictions, and are engaged in a range of financial services businesses. Among its primary business lines is excess insurance which covers losses over and above the amounts covered by the insured's primary insurance policies. principal place of business in New York, New York.

28.     AIG is the Sponsor of the AIG Incentive Savings Plan within the meaning of ERISA, and itself exercised important fiduciary duties and responsibilities.   In addition, by and through its Board of Directors, AIG exercised ultimate decision-making authority for the administration and management of the Plans and the Plans' assets, and appointed all persons who served as fiduciaries for the Plans.  Furthermore because all other Defendants acted in the course and scope of their employment with AIG in the conduct giving rise to liability hereunder, and AIG exercised *de facto* control over them, AIG is liable for the actions of such other defendants under basic principles of vicarious and *respondeat superior* liability.  Thus, AIG is a fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plans, exercises authority or control respecting management or disposition of the Plans' assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plans.

29.     **The Director Defendants.**   Upon information and belief, the AIG Board of Directors ("AIG Board" or the "Board") is responsible for the appointment of the members of the AIG Retirement Board, the administrator of the Plans.  As such, the Director Defendants are fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercise discretionary authority or discretionary control respecting management of the Plans, exercise authority or control respecting management or disposition of the Plans' assets, and/or exercise discretionary authority or discretionary responsibility in the administration of the Plans.

8

A. **Defendant Maurice R. ("Hank") Greenberg** was at all time relevant hereto Chairman of the Board and Chief Executive Officer of AIG until his resignation in March, 2005. As a result of the fiduciary responsibilities and functions described herein, Defendant Greenberg was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

B. **Defendant Howard I. Smith** was at all time relevant hereto Vice Chairman of the Board, Chief Administrative Officer, and Chief Financial Officer of AIG until he was fired in March, 2005. As a result of the fiduciary responsibilities and functions described herein, Defendant Smith was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

C. **Defendant Martin J. Sullivan** was at all time relevant hereto Vice Chairman of the Board and Co-Chief Operating Office of AIG until March, 2005, when he was appointed Chairman of the Board and Chief Executive Officer of AIG. As a result of the fiduciary responsibilities and functions described herein, Defendant Sullivan was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

D. **Defendant Donald P. Kanak** was at all time relevant hereto Vice Chairman of the Board and was Co-Chief Operating Officer of AIG until March, 2005, when he was appointed Chief Operating Officer.  As a result of the fiduciary responsibilities and functions described herein, Defendant Kanak was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

30.    **AIG Retirement Board Defendants**.  The AIG Retirement Board is the Plan Administrator for the AIG Incentive Savings Plan (the "AIG Plan"), as that term is defined under ERISA, and a named fiduciary for the AIG Incentive Savings Plan.  The AIG Retirement Board Defendants'  Plan-related responsibilities include, but are not limited to, administering and managing the AIG Plan on a day-to-day basis, advising the AIG and the AIG Board regarding the AIG Plan and the AIG Plan's assets, construing and interpreting the plan documents, establishing investment guidelines regarding investment of the assets of the AIG Plan, including investments in AIG stock, communicating with AIG Plan participants about the AIG Plan, designating other persons to carry out its duties and responsibilities under the AIG Plan, adopting such rules as deemed "necessary, desirable or appropriate" in the administration of the AIG Plan, and furnishing the AIG Plan Trustee with written instruction regarding contributions to the Trust. Additionally, during the Class Period, upon information and belief, the AIG Retirement Board assumed the duties of the administrators of the American General Employees' Thrift and Incentive Plan and the American General Agents' and Managers' Thrift Plan (the "AGC Plans"). Thus, the AIG Retirement Board members are fiduciaries of the AIG Plan and AGC Plans within the meaning of ERISA § 402(a)(1) because the Retirement Board is a named fiduciary as that term is defined by ERISA, and ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercise discretionary authority or discretionary control respecting management of the Plan, exercise

10

authority or control respecting management or disposition of the Plan's assets, and/or exercise discretionary authority or discretionary responsibility in the administration of the Plan.

    A.  **John Doe Defendants 1-20**.  Plaintiffs currently do not know the identity of all the AIG Retirement Board Defendants during the Class Period, other than as set for below.  Therefore, such persons are named herein as unknown *John Doe Defendants 1-20*.  Once the identities of the other Retirement Board Defendants are ascertained, Plaintiffs will seek leave to join them under their true names.

    B.  **Defendant Richard A. Grosiak** was at all times relevant hereto (with respect to the AIG Plan, and from at least 2002 with respect to the AGC Plans), the administrator of the Plans as that term is defined under ERISA, and served as a member of the AIG Retirement Board.  As a result of the fiduciary responsibilities and functions described herein, Defendant Grosiak was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

    C.  **Defendant Axel I. Freudmann** was at all times relevant hereto Senior Vice President of Human Resources and served as a member of the AIG Retirement Board.  As a result of the fiduciary responsibilities and functions described herein, Defendant Freudmann was a fiduciary within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the management of the Plans, he possessed discretionary authority or discretionary responsibility in the administration of the Plans, and he exercised authority or control with respect to the management of the Plans' assets.

    31.  **Defendant Patricia R. McCann** was at all times relevant hereto plan Vice President of AGC's Benefits and Payroll division and, until at least 2002, the plan administrator

11

for the AGC Plans. Her plan-related duties and responsibilities included, but were not limited to, having the broad power with respect to the administration of the AGC Plans and disposition of the Plans' assets, and communicating with participants of the AGC Plans. As a result of the fiduciary responsibilities and functions described herein, Defendant McMann was a fiduciary within the meaning of ERISA in that she exercised discretionary authority or discretionary control with respect to the management of the Plans, she possessed discretionary authority or discretionary responsibility in the administration of the Plans, and she exercised authority or control with respect to the management of the Plans' assets.

### III.  SUBSTANTIVE ALLEGATIONS REGARDING THE PLANS

**A.     AIG INCENTIVE SAVINGS PLAN**

32.     The AIG Incentive Savings Plan is a defined contribution plan covering eligible employees of the Company. It is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k) *(see, e.g.,* the AIG Plan Document, Section 1.1). The AIG Plan is not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the AIG Plan.

33.     As stated in the AIG Plans' Form 5500 Annual Report, AIG, by the American International Group, Inc. & Consolidated Subsidiaries, is the Sponsor of the plan and the AIG Retirement Board is the administrator of the plan. Its Employer Identification Number is 13-2592361 and the Plan Number is 003. AIG pays the cost of administering the AIG Plan, pursuant to the AIG Plan Document. The Plan Trustee is Vanguard Fiduciary Trust Company ("Vanguard").

34.     The amounts of employee and Company contributions were limited by pertinent provisions of the Internal Revenue Code. Participants directed the investment of their contributions to various investment options in the AIG Plan.

12

35.    Most of these options were diversified mutual funds.  However, among these options was the AIG Stock Fund.  According to AIG's Incentive Savings Plan Summary Plan Description, dated as of August 1998, the AIG Stock Fund "is a non-diversified fund which invests solely in AIG Common Stock."  The Summary Plan Description acknowledged that "The fact that this fund consist only of a single security means it's considered to be a higher risk investment than a diversified portfolio," but sought to encourage participants to invest in it by claiming, in the next sentence, that, "However, it also has a higher earnings potential, since it is tied directly to AIG's performance in the market."  *Id.*

36.    The Company matched the participants' contributions, at certain specified percentages, by making contribution to the participants' accounts.  Pursuant to AIG Plan documents, only AIG's employer matching contributions were eligible to be invested in the AIG Stock Fund, and employees had the ability to direct the employer matching contributions to the investment choices provided by the AIG Plan, including the AIG Stock Fund.  Under the AIG Plan Document (Section 6.5(b)), all dividends, capital gains distributions, and other earnings received on any share or unit of any Funds within the plan, including the AIG Stock Fund, were to be immediately reinvested for the participant in additional shares or units in the same Fund, absent specific investment directions to the contrary.

37.    According to AIG's January 2003 Incentive Savings Plan Summary Plan Description, provided by AIG in response to Plaintiffs' requests, the Plan requires that, "[i]f you transfer any monies out of the AIG Stock Fund, you may not reinvest those monies into the AIG Stock Fund at a later time."  This provision had the effect of discouraging AIG Plan participants from reducing their holdings in AIG stock, which worked against the participants' interest in situations such as the aftermath of the October 14, 2004 disclosures, when participants may have wanted to reduce such holdings to stem losses, but were reluctant to do so for fear of potentially waiving their ability to reinvest those monies in AIG stock at a later time when conditions for such an investment and prospects for gains were more favorable.

13

38.     According to the AIG Plan's Incentive Savings Plan Summary Annual Report, produced by the Defendants, the value of the AIG Plan's assets was $2.04 billion as of December 31, 2003, compared to $947 million as of January 1, 2003.  The plan experienced an increase in assets due largely to the merger into it of the American General Employees' Thrift and Incentive Plan.

**B.     AMERICAN GENERAL EMPLOYEES' THRIFT AND INCENTIVE PLAN**

39.     The American General Employees' Thrift and Incentive Plan (the "AGC Thrift Plan") is a defined contribution plan covering eligible employees of AGC.  It is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k).  The AGC Thrift Plan is not a party to this action.  Pursuant to ERISA, however, the relief requested in this action is for the benefit of the AGC Thrift Plan.

40.     AGC matched the participants' contributions, at certain specified percentages, by making contribution to the employees' accounts.  The amounts of employee and employer contributions were limited by pertinent provisions of the Internal Revenue Code.

41.     According to the AGC Thrift Plan's Form 11 -K, for the year ended December 31, 2000, all of the employer contributions were required to be invested in AGC stock.  Only participants age sixty or older could direct the investment of their employer matching contributions into any of the available funds.  Participants were entitled to invest in one of seven funds.  Most of these funds were diversified mutual funds.  However, among these funds was the AGC Stock Fund, a fund comprised solely of AGC stock.

42.     The AGC Thrift Plan's Form 11 -K for the year ended December 31, 2000, reported total assets held under the plan amounted to $566 million.  Of this amount $360 million, or 63% was invested in AGC common stock.

14

43.     On August 29, 2001, AIG acquired AGC.  One that same date, AIG filed a Form S-8 with the SEC, registering shares of stock to be issued under various plans, including the AGC Thrift Plan.  The S-8 Registration Statement incorporated by reference AIG's annual report on Form 10-K for the year ended December 31, 2000, and AIG's Quarterly Reports on Form 10-Q for the quarters ended March 31 and June 30, 2001.  The S-8 Registration Statement was signed by Defendant Greenberg and Defendant Smith.

44.     On August 29, 2001, the AGC common stock held under the AGC Thrift Plan was automatically exchanged for AIG common stock, at AIG's per share market price of $77.23.

45.     For the year ended December 31, 2001, according to Form 11-K, the AGC Thrift Plan had $499.5 million, or a staggering 67% of the plan's total assets of $746.3 million, invested in AIG common stock.

46.     Effective January 1, 2001, the AGC Thrift Plan was amended to allow participants to reallocate employer contributions in AIG stock to other funds offered by the plan, however this amendment did cause the plan to become diversified.  According to the AGC Thrift Plan's Form 11-K, for the year ended 2002, the plan suffered a loss of $119 million from its investment in AIG common stock.  As of December 31, 2002, even after the $119 million loss in AIG stock, the plan still had $297 million out its total investments of $589 million, or 50.4%, invested in AIG stock.

47.     Instead of diversifying the AGC Thrift Plan's investment in AIG common stock, the fund was merged into the AIG Plan.  Without discovery, Plaintiffs cannot determine precisely how much AIG stock was held within the AIG Plan after the AGC Thrift Plan was merged into it.

48.     However, it is clear that Defendants knew that the AGC Thrift Plan's assets were exposed to extraordinary loss back in 2001, when AIG stock represented 67% of the plan's assets, and suffered a substantial diminution in its value due to the non-diversification of its

assets, yet they failed to diversify the plan or amend the plan documents to require that only a certain portion of a participant's account balance could be invested in AIG stock.

49.    Defendants Greenberg and Smith not only failed to diversify the AGC Thrift Plan, but they also made material misrepresentations to the plan and AGC employees and former employees by signing the Form S-8 registration statement, incorporating AIG's financials, while AIG's financials were materially false and misleading due to the Company's accounting manipulations and the steering and bid-rigging scheme described herein. Defendants Greenberg and Smith knew that AIG stock was an imprudent investment, yet failed to diversify the plan or disclose this information to AGC Thrift Plan's administrators and AGC's former and current employees.

50.    Had the Defendants performed their duties and diversified the AGC Thrift Plan in 2001, much of the loss suffered from the plan's investment in AIG stock would have been avoided.

## C.    AMERICAN GENERAL AGENTS' AND MANAGERS' THRIFT PLAN

51.    The American General Agents' and Managers' Thrift Plan (the "AGC Agents and Managers Plan") is a defined contribution plan covering eligible agents and managers of AGC. It is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k). The AGC Agents and Managers Plan is not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the AGC Agents and Managers Plan.

52.    AGC matched the participants' contributions, at certain specified percentages, by making contribution to the employees' accounts. The amounts of employee and employer contributions were limited by pertinent provisions of the Internal Revenue Code.

53.     According to the AGC Agents and Managers Plan's Form 11-K, for the year ended December 31, 2000, all of the employer contributions were required to be invested in AGC stock.   Only participants age sixty or older could direct the investment of their employer matching contributions into any of the available funds.  Participants were entitled to invest in one of seven funds.  Most of these funds were diversified mutual funds.  However, among these funds was the AGC Stock Fund, a fund comprised solely of AGC stock.

54.     The plan's Form 11-K for the year ended December 31, 2000, reported total assets held under the plan amounted to $148 million.  Of this amount $116 million, or a staggering 78%, was invested in AGC common stock.

55.     On August 29, 2001, AIG acquired AGC.  On that same date, AIG filed a Form S-8 with the SEC, registering shares of stock to be issued under various plans, including the AGC Agents and Managers Plan.  The S-8 Registration Statement incorporated by reference, AIG's annual report on Form 10-K for the year ended December 31, 2000, and AIG's Quarterly Reports on Form 10-Q for the quarters ended March 31 and June 30, 2001.  The S-8 Registration Statement was signed by Defendant Greenberg and Defendant Smith.

56.     On August 29, 2001, the AGC common stock held under the AGC Agents and Managers Plan was automatically exchanged for AIG common stock, at AIG's per share market price of $77.23.

57.     For the year ended December 31, 2001, per Form 11-K, the AGC Agents and Managers Plan had $106 million, or 67%, of the plan's total assets of $158 million, invested in AIG common stock.

58.     Effective January 1, 2001, the AGC Agents and Managers Plan was amended to allow participants to reallocate employer contributions in AIG stock to other funds offered by the plan, however this amendment did cause the plan to become diversified.  According to the AGC Agents and Managers Plan's Form 11-K, for the year ended 2002, the plan suffered a loss of $26.9 million from its investment in AIG common stock.  As of December 31, 2002, even after

17

the $26.9 million loss in AIG stock, the plan still had $69.9 million out its total investments of $120 million, or 58%, invested in AIG stock.

59.    Defendants knew that the AGC Agents and Managers Plan's assets were exposed to extraordinary loss in 2001, when AIG stock represented 67% of the plan's assets, and suffered substantial losses as a result of the non-diversification of its assets, yet they failed to diversify the plan or amend the plan documents to require that only a certain portion of a participant's account balance could be invested in AIG stock.

60.    Defendants Greenberg and Smith not only failed to diversify the AGC Agents and Managers Plan, but they also made material misrepresentations to the plan and AGC agents and managers by signing the Form S-8 registration statement, incorporating AIG's financials, while AIG's financials were materially false and misleading due to the Company's accounting manipulations and the steering and bid-rigging scheme described herein.  Defendants Greenberg and Smith knew that AIG stock was an imprudent investment, yet failed to diversify the plan or disclose this information to AGC Agents and Managers Plan's administrators and AGC's former and current agents and managers.

61.    Had the Defendants performed their duties and diversified the AGC Agents and Managers Plan in 2001, much of the loss suffered from the plan's investment in AIG stock would have been avoided.

## IV.  DEFENDANTS' FIDUCIARY STATUS

62.    **Named Fiduciaries.**  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2).

63.    **De Facto Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.,* perform fiduciary functions (including a juridical person such as AIG).  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent...he exercises any discretionary authority or discretionary control respecting management of such plan or

18

exercises any authority or control respecting management or disposition of its assets...or... has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, appointing plan administrators, overseeing and controlling the plan administrators, and making statements to participants with respect to the Company, its financial results and business prospects.

**A.    AIG's Fiduciary Status**

64.    AIG is the Sponsor of the AIG Incentive Savings Plan and is presumptively responsible for all fiduciary functions with respect to that plan.  AIG is a named fiduciary of the AIG Incentive Savings Plan pursuant to Article XII of the AIG Plan Document.

65.    The AGC Plan documents provide that the AGC Board of Directors are responsible for the appointment of the AGC Plans' administrators.  Upon acquisition of AGC by AIG, Defendant Greenberg and AIG's Board assumed this role.  Therefore, AIG, by and through its Board, is responsible for the appointment and monitoring of the AGC Plans' administrators. As described above, Defendant Patricia McCann was already acting as the AGC Plans' administrator before AIG acquired AGC and she continued to act as the AGC Plans' administrator until the AIG Retirement Board took over the administration of the plans. Therefore, after the acquisition of AGC, AIG, the Director Defendants, including Defendant Greenberg had a continuing duty to monitor Defendant McCann, and if she did not possess the requisite knowledge, skill, and expertise to properly administer the AGC Plans, AIG was under a duty to remove her and appoint qualified plan administrators.  AIG was under a duty to provide Defendant McCann with all information that she needed to perform her duties as the AGC Plans' administrator.    In addition, because Defendant McCann's career, financial livelihood and reputation depended on her ongoing positive relationship with the Company, she was influenced or controlled by the Company's tacit or explicit direction with respect to the management, investment, or disposition of the AGC Plans' assets.  Therefore, AIG was a *de facto* fiduciary of

19

the AGC Plans under ERISA. In addition, AIG is responsible for McCann's acts under ordinary principles of vicarious liability and respondeat superior.

66.     Moreover, at all relevant times for which the AIG Retirement Board was appointed as the Plans' administrator, by choosing to internalize the fiduciary function, AIG has in actuality retained the fiduciary function because the AIG Retirement Board was simply a Board of AIG; if AIG "delegated" the fiduciary function to the AIG Board, it delegated that function to itself. Accordingly, the AIG Board retained the fiduciary function in its oversight of the AIG Retirement Board. The AIG Retirement Board members acted for AIG just as any other employee or agent has acted for AIG in carrying out his or her job. Therefore, ordinary principles of vicarious liability and respondeat superior impose on AIG responsibility for their actions.

67.     The AIG Retirement Board was dominated by AIG. Not only were AIG Retirement Board members subject to removal at the pleasure of AIG, but because they were Company employees, officers, and/or directors, their careers, financial livelihoods and reputations depended on their ongoing positive relationship with the Company. As a result, the AIG Retirement Board were influenced or controlled by the Company's tacit or explicit direction with respect to the management, investment, or disposition of plan assets.

68.     AIG's responsibilities also include appointing persons to serve as plan fiduciaries, and, thus, monitoring such persons. Therefore, even if an otherwise effective delegation occurred with respect to the AIG Retirement Board, AIG had a fiduciary duty to monitor the persons it appointed to perform fiduciary functions for it. This includes a duty to provide the plan fiduciaries with all information that they needed to perform their duties.

69.     With respect to these and all other plan-related duties and responsibilities, AIG acted through its Board. Accordingly, AIG is a fiduciary of the Plans within the meaning of ERISA in that it exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

20

70.    Moreover, AIG is responsible for all the acts of Defendants as stated in its Form S-8 Registration Statement that registered the AIG shares received by the AGC Plans and the Class. The Form S-8 Registrations statement, which was filed with the SEC on August 29, 2001, stated, at Item 6, that "AIG shall indemnify to the fullest extent permitted by law any person made, or threatened to be made, a party to an action...by reason of the fact that he...is or was a director, officer or employee of AIG...including services by a director, officer or employee with respect to an employee benefit plan." Furthermore, AIG stated in the Form S-8 that "The Thrift Plans [the AGC Plans] included as exhibits to this registration statement...pro vide that the Company 'shall indemnify all those to whom it has delegated fiduciary duties against any and all claims, loss, damages, expense, and liability arising from their responsibilities in connection with the [p]lan...."

## B.    The Director Defendants' Fiduciary Status

71.    As alleged above, AIG at all times acted through its Board in carrying out its plan-related duties and responsibilities. The Board, thus, is the human agent that carries out AIG's ultimate decision-making authority for the Plans and the Plans' assets.

72.    The Board also is responsible for appointing, and, thus, monitoring the Plans' administrators, itself a very important fiduciary duty. The Director Defendants were fiduciaries with responsibility for monitoring their appointees to ensure that they prudently and loyally served the interests of the participants. In addition, as monitoring fiduciaries, the Director Defendants had an affirmative obligation to provide the Plans' administrators with relevant information in their possessions that they knew or should have known the members needed in order to prudently and loyally manage the Plans and the Plans' assets, including information pertaining to AIG stock.

73.    Thus, the Board members are fiduciaries of the Plans within the meaning of ERISA in that it exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

21

74.    Plaintiffs do not at this time name all persons who served as members of the Board during the Class Period.  Instead, Plaintiffs only name the top executive officers of AIG because as such they made the important decisions with respect to the management of the Plans, and they had intimate knowledge of the Company's business operations and practices and, therefore, knew or recklessly ignored that the Company was involved in illegal activities.

75.    If Plaintiffs discover that other Board members knew or should have known about the illegal operations of the Company, Plaintiffs will seek leave as necessary to amend the Complaint.

**C.    The AIG Retirement Board Defendants' Fiduciary Status**

76.    AIG, at all times relevant hereto, had purportedly delegated to the AIG Retirement Board all powers necessary for the administration of the Plan.

77.    Because the Retirement Board acted only through its members, those members had the same authority and responsibility as the Retirement Board itself.

78.    In this regard, the AIG Retirement Board members authored and signed the Plans' documents and information required by ERISA and managed the operations of the Plans on a day-to-day basis.

79.    Thus, the AIG Retirement Board members are fiduciaries of the Plans within the meaning of ERISA in that it exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.

**D.    Defendant McCann**

80.    Defendant McCann was appointed and served as administrator of the AGC Plans by AGC's Board of Directors and served in such capacity during the Class Period prior to the time AIG acquired AGC, and continued to administer the AGC Plans after the acquisition.

81.    In this connection, Defendant McCann authored and signed the AGC Plans' detailed information required by ERISA and managed the operations of the AGC Plans on a day-to-day basis.

22

82.     Thus, Defendant McCann is a fiduciary of the AGC Plans within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the AGC Plans; and/or (ii) management and disposition of the AGC Plans' assets.

### V.  AIG'S ILLEGAL SCHEMES TO DEFRAUD CUSTOMERS AND TO MISREPRESENT THE COMPANY'S ACTUAL FINANCIAL CONDITION

**A.     AIG's Corporate Culture of Unparalleled Financial Results.**

83.     Although AIG was founded in the early part of the 20th Century, the Company's extraordinary growth to become the world's largest insurance conglomerate began in 1967 when Maurice ("Hank") Greenberg assumed control as Chairman and CEO.

84.     The business media came to understand that AIG would share very little information about the inner workings of the company.  Greenberg's approach was to post consistently positive financial results with no intention of explaining how such results were possible.  The insurance industry is notoriously vulnerable to business cycles because insurance companies are dependent on the performance of their investment of premium payments.  AIG's earnings reports rarely, if ever, reflected such market influences.  AIG's inner workings remained opaque to the public.  Occasional glimpses afforded a view of complex corporate relationships and transactions of byzantine proportions.  Increasingly detailed revelations beginning in October 2004 have reveal the truth behind the myth: AIG's financial record was a fantasy concocted through fraud and illegal accounting gimmickry and tricks over the last five years. In some cases, the financial misstatements go back to the early 1990s.

85.     Consistently strong financial results appear to have allowed AIG to operate without the usual scrutiny of the financial and business media.  AIG's culture of secrecy and its single-minded drive to report strong financial growth created an atmosphere in which fundamental rules of ethical behavior and accounting were broken with increasing ease.

23

86.     On May 3, 2005, <u>The New York Times</u> reported that AIG would restate its earnings back to 2000, and reduce the company's net worth by $2.7 billion on an after-tax basis. The final before-tax figure will likely be much greater.  The paper quoted an AIG spokesman on May 1, 2005, stating that the errors in AIG's accounting:

> ...appear to have had the purpose of achieving an accounting result that would enhance measures important to the financial community and that may have involved documentation that did not accurately reflect the nature of the arrangements.

**B.      AIG's Involvement In Marsh & McLennan's Bid-Rigging and Contingent Commission Fee Scheme.**

87.     In October 2005, the New York Attorney General's Office ("Attorney General") filed a complaint against insurance broker Marsh & McLennan Companies, Inc. ("Marsh"), alleging a long-standing scheme by Marsh and several large insurance companies to defraud Marsh's clients who were also customers of the insurance companies.

88.     AIG was one of the handful of insurers named in the Attorney General's complaint.  An article in the February 21, 2005 edition of *Fortune* magazine quotes Credit Suisse First Boston as recently noting that "Marsh is AIG's principal source of business; in turn, AIG is Marsh's principal market."  The fact that Hank Greenberg's son, Jeffrey Greenberg, was the CEO and Chairman of Marsh further underscores the companies' close relationship.

89.     As the Attorney General's investigation proceeded, much of it in the public eye, Marsh and AIG's fraudulent scheme was revealed.  As the largest insurance broker in the world, Marsh's clients relied on their broker for unbiased representation to navigate the complexities of purchasing millions of dollars worth of insurance.  Marsh's clients relied on Marsh to determine the type and amount of coverage needed and to find that coverage in the marketplace at the lowest cost.  Marsh's clients assumed that Marsh was their loyal advocate, particularly given the broker's fiduciary duties to its clients.  Instead, quite the opposite was true.  Marsh served only its own financial interests in breach of its fiduciary duties and AIG was Marsh's willing accomplice.

24

90.     Without the disclosure to their clients required by law, Marsh entered into contingent commission fee agreements called "management service agreements" or "MSAs" with AIG under which AIG paid Marsh for the number of policies placed or renewed with AIG by Marsh clients.  The MSAs created a direct financial incentive for Marsh to persuade as many clients as possible to purchase and renew policies from AIG.  The more business Marsh steered to AIG, the higher the percentage commission AIG paid Marsh.

91.     The scheme did not end with the MSAs.  With MSAs in place with three or four insurance companies, Marsh set out to control which insurance company its clients purchased insurance from by rigging the bids provided to its clients by the insurance companies.  AIG was a willing participant in the bid rigging scheme as it was in the MSAs.  Marsh routinely solicited inflated bids from insurance companies, signaling which company was to provide the "winning" bid.  Of course, all of the bids were inflated, even the "winning" bid from the company selected by Marsh.  Marsh and AIG manipulated the bid pricing to ensure both higher prices for policies and a higher percentage of total policy placement and renewal for AIG then the market would have produced without the scheme.

92.     A total of four top AIG executives pled guilty in February 2005 to charges of first degree felony "scheme to defraud" for their roles in the contingent commission fee and bid rigging scheme.

93.     In reaction to disclosure of the Attorney General's complaint against Marsh, the price of AIG common stoke dropped in two days from $66.99 per share to $57.85 per share in a decline of $9.14 per share or 13.64%.

94.     In addition, AIG's participation in the contingent commission fee and bid rigging scheme may lead to claims asserted by the New York Attorney General and has spawned legal actions against AIG by shareholders, customers and other governmental agencies.  Investigations are proceeding and further information may come to light before the many claims against AIG

arising from this episode are resolved.  Resolution of such claims presents a future liability for AIG in an unknown amount.

**C.     AIG's Failure to Properly Characterize the Gen Re Finite Risk Insurance Transaction.**

95.     By February 2005, however, it became clear that there were many more disturbing revelations to come from AIG.

96.     In February 2005, the New York Attorney General opened an investigation into a finite risk policy which AIG sold to General Reinsurance ("Gen Re"), a unit of Berkshire Hathaway, Inc., in 2000.   The Attorney General believed that AIG mischaracterized the transaction as the sale of insurance when AIG had not actually assumed any risk in return for the premium Gen Re paid.   In the absence of risk transfer, the transaction could not legally be recorded as the sale of insurance.  AIG had, however, booked the transaction as the sale of an insurance policy.

97.     Hank Greenberg's refusal to cooperate with the Attorney General in response to a subpoena in this investigation led to Mr. Greenberg's removal as CEO and, soon thereafter, as Chairman of AIG's Board of Directors.  This ended Mr. Greenberg's 38 year reign over the world's largest insurance company.  The company had already dismissed two senior executives for their refusal to cooperate with the Attorney General's investigation.   When Greenberg refused to cooperate, his separation from the company was a foregone conclusion.

98.     Finite risk insurance, which is a type of reinsurance, is a relatively recent invention.  Reinsurance is a means by which an insurance company can purchase insurance to cover their losses on potential future insurance claims.   Reinsurance allows an insurance company to share the risk of having to pay out on large claims with a second carrier. The second carrier is called the reinsurer.

99.     Finite risk insurance can refer to a variety of highly specialized reinsurance transactions.  In a classic finite risk transaction, a company purchases an insurance policy from

26

the an insurer to cover the insured's liability for a set of anticipated insurance claims . The policy premium equals roughly the total amount the insured would have to pay if all of the anticipated claims are tendered for full payment. If fewer then all of the potential claims actually develop and, therefore, fewer then all of the claim are never tendered for payment, the portion of the original premium not used to pay claims is returned to the insured at the end of the policy. Given the large initial premium payment and the potential return of a substantial portion of the initial premium payment, finite risk policies can look very similar to a loan.

100.    Finite risk policies may involve a package of potential future claims, in which there may be an actual transfer of risk. On the March 31, 2005, *The Wall Street Journal* reported that finite risk policies have also been used with respect to packages of existing claims for which the cost to pay the claims is already known. This type of finite risk policy has raised questions because existing claims do not carry with them the risk of future, unknown liabilities. For a transaction to count as the sale of insurance, there must be a transfer of the risk of future, unknown liabilities.

101.    Finite risk transactions can become even more complicated if a "side letter" or "back end arrangement" accompanies the deal. Such an arrangement can limit whether the insured can or will actually tender claims to the reinsurer under the finite risk policy for payment. If a side letter prevents the insured from collecting on the reinsurance under the finite risk policy, then there has been no transfer of risk and the transaction should not be booked as insurance.

102.    As reported in The Wall Street Journal, on March 31, 2005, Gen Re purchased finite risk insurance from AIG for a $500 million premium. At the same time, Gen Re shifted liability for $500 million in claims to AIG. In theory, the claims now "reinsured" under the finite risk policy. AIG booked the premium payment as revenue and increased its reserves by $500 million to reflect the new claim liability. The odd fact is that Gen Re and AIG already knew it would take $500 million to pay the claims, which meant that AIG did not assume a risk

27

of loss in the future i.e, that it could cost for more then the premium paid to pay the claims. A second part of the transaction provided that AIG would be liable for an additional $100 million in claims should new losses develop, but this liability may have been nullified by a side letter or similar back end transaction.

103.    Without risk transfer from Gen Re to AIG in exchange for the premium payment, the $500 million payment AIG received from Gen Re should not have been recorded as a premium payment, i.e. as earnings. AIG admitted by March 31, 2005, that there was, in fact, no risk transfer and its original accounting of the transaction was wrong. Regulators argued that the $500 million payment from Gen Re should have been recorded as a loan.

104.    The Gen Re transaction remains under investigation by the Attorney General and other government agencies. This investigation may also lead to civil claims asserted by the Attorney General and others. Resolution of such claims presents a future liability for AIG in an unknown amount.

**D.    AIG's Has Admitted to Numerous Additional Accounting Improprieties that Require Restatement of its Annual Reports Back to 2000.**

105.    On the heels of the bid-rigging scheme, the finite risk policy investigation and the ouster of top management at AIG, there were still more disturbing revelations to come from AIG.

106.    By May 31, 2005, AIG was forced to announce that its 2004 10-K annual report would be delayed by another 30 days because of accounting issues that went well beyond those created by the contingent commissions fee and bid rigging scheme and mischaracterization of the finite risk transaction with Gen Re in 2000.

107.    AIG listed the following areas where further restatement of its annual report would be required based on its ongoing internal investigation.

> (a) AIG admitted to mischaracterizing its exclusive relationship with off-
>        shore reinsurance companies Richmond Insurance Company and

28

Union Excess Reinsurance. Although AIG had treated multiple reinsurance transactions worth hundreds of million of dollars with each company as arms-length deals with separate corporations, both companies should, in fact, have been treated as companies controlled by AIG. The New York Times reported March 23, 2005, that all of Richmond's premiums were earned on finite risk policies sold to AIG.

(b) AIG admitted that it booked $300 million in gains on its bond portfolio from 2001 through 2003, before it actually sold the bonds. Instead, AIG should have booked the $300 million bonds transactions as "realized capital gains" after it sold the bonds.

(c) AIG admitted that it may need to take an after-tax charge of $300 million for uncollectable accounts in is brokerage group.

(d) AIG admitted that it may need to take an additional after-tax charge of $370 million for improper accounting of up-front commissions paid to insurance agents.

(e) AIG admitted that its deferred compensation program through the Starr International Company, worth tens of millions of dollars to select senior executives, would be recorded as an expense incurred by AIG. The extremely generous payments under the deferred compensation under the program was only available to the executives upon retirement. Starr International and C.V. Starr continue to operate as separate off-shore corporate entities privately owned and controlled by Mr. Greenberg. Both companies are involved in a complex web of financial relationships with AIG which remain to be examined.

(f) AIG admitted that it will restate operating income to address its improper transformation of $200 million in underwriting losses into

29

capital losses. AIG used a transaction with Capco Reinsurance Co. of Barbados to hide $200 million in underwriting losses relating to its auto warranty business. AIG also failed to correctly treat Capco as an AIG subsidiary.

108.    AIG estimated March 31, 2005 that the expected restatement of earnings would reduce company's net worth by $1.77 billion.

109.    The Wall Street Journal reported March 17, 2005, that AIG had additional accounting concerns. AIG has sold hundreds of finite risk policies to its own insureds covering existing, rather than future, liabilities. Misstatement of these transactions could exceed $100 million. Under settlements in two prior lawsuit involving characterization of policies sold to two AIG insureds, an independent monitor is now reviewing AIG's books to determine whether there are additional questionable deals. The same article raised concerns about valuation of long-term leases in AIG's aircraft leasing business and AIG's accounting for expected reinsurance payments from its own reinsured.

110.    On May 2, 2005, Business Insurance reported that AIG would delay issuance of its Annual Report for another 30 days. This announcement was accompanied by revelations of still more accounting improprieties that AIG needs to resolve before it can issue its annual report.

111.    Business Insurance reported May 2, 2005, that insurance commissioners from several states were investigating AIG's misclassification of workman's compensation insurance premiums as premiums paid for general liability policies. State officials allege that this allowed AIG to avoid paying tens of millions of dollars into New York's Worker's Compensation Funds. This practice was ongoing in 1992, when a memo from AIG's general counsel sternly warned upper management at AIG that the practice was illegal. AIG stated that it stopped the practice in 1997. This issue remains under investigation and may lead to additional claim and liability for AIG in an unknown amount..

112.    As of May 3, 2005, *The New York Times* reported new areas of concern, including:

      (a) "Top level" adjustments which involve $100 million of accounting entries made to increase reported earnings without appropriate support.

      (b) Manipulation of income through temporary redemption of certain investments in hedge funds to generate investment income, followed by immediate re-purchase of the investments after the financial reporting period ended.

      (c) Improper accounting for "life settlements" which allow life insurance policyholders to cash in their polices while that are still alive.

113.    As recently as April 5, 2005, <u>The Wall Street Journal</u> reported that New York Attorney General Eliot Spitzer's office expected to reach a civil settlement with AIG.  AIG's improprieties have compounded in the succeeding month and further investigation will follow. The number and scope of claims AIG will face and the additional liabilities AIG will ultimately face remain to be determined.

## VI. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

175.    Because of Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided them in connection therewith.

178.    Because of the access to this information, the Defendants knew or recklessly ignored, AIG's involvement in the customer steering and bid-rigging scheme.  Defendants knowledge or reckless ignorance is also established by the fact that the Company regularly paid

31

Marsh extraordinary expensive commissions and other insurance companies were not able to compete against AIG for business.

179.    In addition, the Defendants also knew or recklessly ignored that the Company's ability to retain its dominance of the insurance market and its ability to keep other insurance companies "out of the competition," was dependent upon its ongoing participation with Marsh, ACE, and others, in the customer steering and bid-rigging scheme.

180.    Furthermore, AIG has admitted that it had improperly accounted for several reinsurance transactions and the Company stated that many of its reinsurance transactions "appear to have been structured for the sole purpose or primary purpose of accomplishing a desired accounting effect."

181.    Accordingly, the Director Defendants knew or should have known that AIG derived a substantial amount of revenue and income from unsustainable business practices and accounting manipulation and therefore AIG's stock was artificially inflated.

182.    Moreover, given the amount of revenue generated from the schemes, and the extensive planning, coordination, and communication necessary in order to orchestrate and perpetuate the schemes, it is inconceivable that the Company's executive officers - especially given Defendant Greenberg's exceedingly hands-on management style and AIG's corporate culture - did not have personal knowledge of the schemes.

183.    Furthermore, with regard to the customer steering and bid-rigging scheme, Defendant Greenberg, because of his close familial relationship with the chief executives of Marsh and ACE - his sons, each of whom he had worked with closely for approximately twenty years in this family business - knew or should have known of the scheme because of the abnormal amount of activity between the companies and the inability of other insurance companies to compete for business.

184.    Not only was AIG's stock inflated by revenue improperly obtained and recognized as a result of illegal activity, but, because of AIG's central involvement in the

32

steering and bid- rigging scheme, and its engagement in accounting manipulation, the Company has been exposed to massive penalties and/or fines.

185.    The Defendants knew or should have known that the Company was exposed to massive penalties and/or fines because of its involvement in illegal activities.    Defendants regularly communicated with employees, including the Plans' participants and beneficiaries, about AIG's financial performance, future financial and business prospects, and the attractiveness of AIG stock.

186.    Despite the Defendants knowledge of AIG's risky and illegal business practices, during the Class Period, the Company fostered a positive attitude toward AIG as an investment for the Plans.  Management touted strong Company performance and stock benefits.  Employees continually heard positive news about AIG's growth, were led to believe that AIG stock was a good investment, and that the Plans were prudently managed.

187.    Moreover, AIG publicly repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be derived from illegal business practices during the Class Period.

188.    As fiduciaries, the Defendants had a duty to provide participants with complete and accurate information regarding the Plans' investment options, including the AIG Stock Fund. Despite these duties, however, the Defendants failed to provide the Plans' participants with complete and accurate information regarding AIG stock, such that the participants could appreciate the true risks presented by investments in the stock and could make informed decisions regarding investments in the AIG Stock Fund.

189.    Employees never received any information from the Company or any other of the Plans' fiduciaries that indicated that the Company's stock was not a prudent investment for their funds remaining in the Plans.

190.    AIG employees and the Plans' participants were led to believe that AIG stock was a prudent investment and that the Plans were managed properly.    These misleading

33

communications regarding the performance of AIG stock and its true value caused Plaintiffs and the Class to invest in the AIG Fund and to maintain that investment to their detriment.

191.    Moreover, the Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

(a) Out of loyalty, employees tend to invest in company stock;

(b) Employees tend not to change their investment option allocations in the plan once made;

(c) Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d) Many employees do not recognize their exposure to massive loss from failing to diversify their investments.

192.    Even though the Defendants knew or recklessly disregarded these facts, and even though they knew of the high concentration of the Plans' participant funds invested in the AIG Stock Fund, they did nothing to address the problem.

193.    Defendants concealment of material non-public information, as well as their improper influence on the Plans' participants, caused Plaintiffs and the Class to invest in AIG stock and retain their investment in the stock.   The investment decisions of Plaintiffs and the Class were dependent on the misrepresentations of the Defendants.

## VII.  THE LAW UNDER ERISA

114.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

115. · ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such

34

breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

116.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

117.   ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

118.   These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a) The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance AIG Stock Fund, which invested in AIG stock, to ensure that each investment is a suitable option for the plan;

(b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c) The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete

35

and accurate information material to the circumstances of participants and beneficiaries.

119.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

120.    Insofar as any Defendant is sued alternatively as a knowing participant in a breach of fiduciary duty for equitable relief, Plaintiffs proceed pursuant to ERISA § 502(a)(3), 29 U.S.C.

§ 1132(a)(3).

## VIII.   ERISA § 404(C) DEFENSE INAPPLICABLE

121.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

122.    ERISA § 404(c) does not apply here for several reasons. First, ERISA § 404(c) does not and cannot provide any defense to the Plan *fiduciaries'* imprudent decision to select and continue offering AIG stock in the Plans, as that decision was not made or controlled by the *participants*. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550).[1]

---

[1] *See also* Final 404(c) Reg., 1992 WL 277875, at *46922 (emphasizing that "the act of designating investment alternatives . . .in an ERISA section 404(c) plan is a fiduciary function to which the limitation on liability provided by section 404(c) is not applicable. All of the fiduciary provisions of ERISA remain applicable to both the initial designation of investment alternatives . . . and the ongoing determination that such alternatives and managers remain suitable and prudent investment alternatives for the plan.").

36

123.     Second, even as to participant directed investment in AIG stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding AIG stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in AIG stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

124.     Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiffs and the Class (as defined below) for losses caused by the Plan's investment in AIG stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

## IX.  CAUSES OF ACTION

### COUNT I

**Failure to Prudently and Loyally Manage the Plan and Plan Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by Retirement Board**
**Defendants and Defendants McCann)**

125.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

126.     At all relevant times, as alleged above, the Defendants named in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

127.     As alleged above, the scope of the fiduciary duties and responsibilities of the Defendants named in this Count included managing the Plan's assets for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.

128.    Yet, contrary to their duties and obligations under ERISA, Defendants named in this Count failed to loyally and prudently manage the assets of the Plans. Specifically, during the Class Period, these Defendants knew or should have known that AIG no longer was a suitable and appropriate investment for the Plans, but was, instead, a highly speculative and risky investment in light of the Company's improper business and accounting practices, and misleading financial statements and disclosures. Nonetheless, during the Class Period, these Defendants continued to offer AIG stock in the Plans, and severely restrict participants' ability to sell shares of AIG stock. They did so despite evidence that the Company was being seriously mismanaged, and was issuing misleading and inaccurate financial statements to the SEC, the investing public, and participants that artificially inflated the value of the stock, and exposed the Plans' investment in the stock to huge risk and certain losses once the truth was revealed.

129.    Further, given that such a high concentration of the assets of the Plans were invested in the stock of a single company, AIG, Defendants named in this Count were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. Defendants failed to implement any such strategy.

130.    In addition, Defendants named in this Count failed to conduct an appropriate investigation of the merits of continued investment in AIG stock in light of the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in AIG stock under these circumstances.

131.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

38

132.    Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in AIG; failing to notify appropriate federal agencies, including the Department of Labor ("DOL"), of the facts and circumstances that made AIG stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; ***with respect to each of these above failures***, doing so in order to avoid adversely impacting their own compensation or drawing attention to AIG's inappropriate practices; and by otherwise placing their own and AIG's improper interests above the interests of the participants with respect to the Plan's investment in AIG stock.

133.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

134.    As a consequence of the Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If the Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

135.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

**Failure to Provide Complete and Accurate Information to Participants and Beneficiaries
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Retirement Board Defendants and Defendant McCann)**

136.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

137.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).

138.    As alleged above, the scope the Defendants' duties named in this count included disseminating Plan documents and/or Plan-related information to participants regarding the Plan and/or assets of the Plan.

139.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plans or the assets of the Plans assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all the investment options of the Plans', including investment in AIG stock.

140.    Because a substantial percentage of the assets of the Plans assets were invested in AIG stock, such investment carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to AIG stock.

141.    The Defendants named in this Count breached their ERISA duty to inform participants by failing to provide complete and accurate information regarding the Company and AIG stock, and, generally, by conveying through statements and omission inaccurate information

40

regarding the soundness of AIG stock, and the prudence of investing retirement contributions in the stock.

142.    As a consequence of the failure of the Defendants named in this Count to satisfy their duty to provide complete and accurate information under ERISA, participants lacked sufficient information to make informed choices regarding investment of their retirement savings in AIG stock, or to appreciate that under the circumstances known to Defendants, but not known by participants, that AIG stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.    Had accurate information been provided, participants could have protected themselves against losses accordingly.

143.    Defendants failure to provide complete and accurate information regarding AIG stock was uniform and Plan-wide, and impacted all participants of the Plans the same in that none of the participants received crucial, material information regarding the prudence of AIG stock as a Plan investment option.

144.    As a consequence of the Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses.    If the Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plans would have been minimized or avoided.    Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

145.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

41

## COUNT III

### Failure to Monitor Fiduciaries
### (Breaches of Fiduciary Duties in Violation of
### ERISA § 404 by Board of Director Defendants and AIG)

146.    Plaintiff incorporates the allegations contained in the previous paragraphs of this
Complaint as if fully set forth herein.

147.    At all relevant times, as alleged above, the Defendants were fiduciaries within the
meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties
of loyalty, exclusive purpose, and prudence.

148.    At all relevant times, as alleged above, the scope of the fiduciary responsibilities
of the Defendants named in this Count included the responsibility to appoint, and remove, and
thus, monitor the performance of the Retirement Board Defendants.

149.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries
are performing their fiduciary obligations, including those with respect to the investment and
holding of plan assets, and must take prompt and effective action to protect the plan and
participants when they are not.

150.    The monitoring duty further requires that appointing fiduciaries have procedures
in place so that on an ongoing basis they may review and evaluate whether investment
fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work
and the plan's performance, and by ensuring that they have a prudent process for obtaining the
information and resources they need).  In the absence of a sensible process for monitoring their
appointees, the appointing fiduciaries would have no basis for prudently concluding that their
appointees were faithfully and effectively performing their obligations to plan participants or for
deciding whether to retain or remove them.

151.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with
complete and accurate information in their possession that they know or reasonably should know
that the monitored fiduciaries must have in order to prudently manage the plan and the plan

42

assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

152.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing altogether to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees imprudent actions; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of AIG's highly risky and inappropriate business and accounting practices, and the likely impact of such practices on the value of the Plan's investment in AIG stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the assets of the Plans; and (d) failing to remove appointees named herein whose performance was inadequate in that they continued to make and maintain huge investments in AIG stock despite their knowledge of practices that rendered AIG stock an imprudent investment during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

153.    As a consequence of the Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

154.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

43

## COUNT IV

### Knowing Participation in a Breach of Fiduciary Duty
### (Breaches of Fiduciary Duties in Violation of
### ERISA §§ 404 and 502(a)(3) by AIG)

155.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

156.    To the extent that AIG is found not to have been fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, AIG knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

157.    AIG benefited from the breaches by discharging its obligations to make contributions to the Plans in amounts specified by the Plans by contributing AIG stock to the Plans while the value of the stock was inflated as the result of AIG's highly risky and improper business and accounting practices, and by providing the market with materially misleading statements and omissions.   Accordingly, AIG may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of AIG stock which would have been contributed to the Plan, but for AIG's participation in the foregoing breaches of fiduciary duty.

### X.  CAUSATION

158.    The Plans suffered hundreds of millions of dollars in losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in AIG stock during the Class Period, in breach of Defendants' fiduciary duties.

159.    Defendants are liable for the Plan's losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants withheld material, non-public facts from participants, and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of AIG, and its soundness as an investment

44

vehicle. As a consequence, participants did not exercise independent control over their investments in the AIG stock, and Defendants remain liable under ERISA for losses caused by such investment.

160. Had the Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in AIG stock, eliminating AIG stock as an investment alternative when it became imprudent, and divesting the Plan of AIG stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## XI. REMEDY FOR BREACHES OF FIDUCIARY DUTY

161. The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the assets of the Plans should not have been invested in AIG stock during the Class Period.

162. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

163. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

164. With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the assets of the Plans in the most profitable alternative investment available to them. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

45

165.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

166.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## XII. CLASS ACTION ALLEGATIONS

167.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plans at any time between December 1, 1998 and the present (the "Class Period") and whose accounts included investments in AIG.

168.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

169.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

46

(a) whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b) whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan' participants and beneficiaries;

(c) whether Defendants violated ERISA; and

(d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

170.  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

171.  Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

172.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

173.  Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any

47

questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.  A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.  A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.  An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.  Imposition a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.  An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.  An Ordering requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in AIG stock;

G.  Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H.  An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.  An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

48

J.   An Order for equitable restitution and other appropriate equitable and injunctive relief

against the Defendants.

Dated: _____, 2005

Respectfully submitted:

_____
Marian P. Rosner (MR-0410)
Robert C. Finkel
Andrew E. Lencyk
**WOLF POPPER LLP**
845 Third Avenue
New York, New York  10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

Lynn Lincoln Sarko
Derek W. Loeser
Erin M. Riley
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

49